J-A21010-25
J-A21011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.C., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 447 MDA 2025 |

Appeal from the Decree Dated March 20, 2025
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-9666

| | | |
|---|---|---|
| IN THE INTEREST OF: E.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: S.D.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 454 MDA 2025 |

Appeal from the Decree Entered March 20, 2025
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-9666

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED NOVEMBER 25, 2025**

S.C., Jr. (Father), and S.D.B. (Mother) (collectively, Parents) have filed

separate appeals from the decrees involuntarily terminating their parental

rights to E.L.C. (Child), born in December 2018.[1]  After careful review, we affirm.

*Factual and Procedural History*

Parents have been in a long-term relationship for nearly a decade.  N.T., 2/28/25, at 138-39.[2]  They have a history of "serious drug addiction," mental health issues, and domestic violence.  Orphans' Court Opinion (OCO), 4/28/25, at 2.

In 2023, Parents separated for "a short period of time."  N.T. at 99.  Mother was living with Child and another man in July 2023, when Luzerne County Children and Youth Services (CYS) received a report that police had found methamphetamines in the residence.  ***See id.*** at 98-99; ***see also*** OCO at 1.  Upon further investigation, CYS learned that Mother had obtained a protection from abuse (PFA) order against Father.  ***See*** OCO at 1.  CYS also learned that on July 6, 2023, Father tested positive for fentanyl.  ***See*** N.T. at 133.

_____

[1] We review Parents' appeals together because they raise substantially similar issues and involve the same factual and procedural history.

[2] For the majority of the time relevant to this appeal, Parents lived in a trailer owned by Father's parents and located "next door" to Father's parents' home. ***Id.*** at 117, 142.

On July 12, 2023, Child was adjudicated dependent. The court set Child's permanency goal as reunification with Parents.[3] In furtherance of that goal, the court ordered Parents to obtain drug and alcohol and mental health evaluations at the Robinson Counseling Center and to follow all resulting recommendations. *Id.* at 78-79. The court also directed Parents to participate in "the color call-in system for drug screening."[4] *Id.* Finally, the court required Father to enroll in a batterers' intervention program and directed Mother's involvement with the Domestic Violence Service Center. *Id.*

On November 5, 2024, CYS filed separate petitions to terminate Parents parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). Child was five years old and had been in CYS's care for approximately 16 months. During that time, the majority of Parents' drug screen results were positive for fentanyl and/or cocaine, and they failed to successfully participate in court-ordered programs.

The orphans' court held a termination hearing on February 28, 2025. CYS presented testimony from (1) George Hockenbury, the Northern Tier employee who analyzed Parents' drug screen results;[5] (2) Brianna Pasterchik,

---

[3] Around the time of Child's adjudication, Parents reconciled and Mother withdrew her PFA action against Father.

[4] Parents were assigned the color orange which meant that they were required to report for drug testing "at least twice a week." OCO at 1-2.

[5] CYS introduced Parents' drug screen results from Northern Tier as Exhibit 2.

a clinical supervisor for the substance abuse program at Robinson Counseling; (3) Sonja Griemsmamn, an employee at the Batterers' Intervention Program; (4) Alecia Singer, a mental health clinician at Robinson Counseling; (5) Jamie Stuart, the CYS caseworker; and (6) Lisa Wall, Child's foster care caseworker. Parents testified in opposition to termination. Father also presented the testimony of his mother (Paternal Grandmother).

By decrees dated March 17, 2025, and entered March 20, 2025, the orphans' court terminated Parents' rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). On March 31, 2025, and April 2, 2025, Father and Mother filed respective notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On April 28, 2025, the orphans' court filed a single opinion with respect to both appeals pursuant to Rule 1925(a).[6]

_____

[6] Child's legal interests and best interests were represented by Maria M. Turetsky, Esquire, who was Child's guardian *ad litem* in the dependency proceedings. On August 28, 2025, this Court remanded the case for the orphans' court to make a determination as to whether there was a conflict between Child's legal and best interests. ***See In re Adoption of K.M.G.***, 240 A.3d 1218, 1235-36 (Pa. 2020) ("[W]here an orphans' court has appointed a GAL/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court … [has] fulfill[ed] its duty under Section 2313(a) … [of] determin[ing] whether counsel can represent the dual interests…."); ***see also*** 23 Pa.C.S. § 2313(a). On remand, the orphans' court conducted a hearing and determined that there was no conflict between Child's legal and best interests. Thus, Child was properly afforded her right to counsel during the termination proceeding pursuant to Section 2313(a) of the Adoption Act.

*Discussion*

On appeal, Parents challenge the sufficiency of the evidence to support termination of their parental rights under 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[7] **See** Father's Brief at 6; **see also** Mother's Brief at 5.

In reviewing Parents' arguments, we consider whether termination was supported by competent evidence. **See In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. **See Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). "Where the [orphans'] court's factual findings are supported by the evidence, an appellate court may not disturb the [orphans'] court's ruling unless it has discerned an error of law or abuse of discretion." **In re Adoption of L.A.K.**, 265 A.3d 580, 591 (Pa. 2021). Our Supreme Court has stated that an abuse of discretion "does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** Our standard of review reflects our deference to orphans' courts, who often

---

[7] The GAL filed an appellee brief advocating for affirmance of termination pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).

- 5 -

observe the parties first-hand during multiple hearings. *See Interest of S.K.L.R.*, 256 A.3d at 1123–24.

Termination of parental rights is governed by the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S. § 2511. The orphans' court must initially determine whether the conduct of the parent warrants termination under Section 2511(a). If the court finds grounds for termination under Section 2511(a), it must then assess the child's needs and welfare under Section 2511(b). *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). This Court need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights. *See In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted). In this case, we conclude that the evidence supports termination under Section 2511(a)(2) and (b).

The relevant provisions of the Adoption Act state:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

- 6 -

>(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>. . .
>
>**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

Grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *See In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017). Accordingly, the orphans' court may reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available

services during dependency proceedings. *See In re S.C.*, 247 A.3d at 1105 (citation omitted).

With respect to Section 2511(b), the orphans' court is required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). A child's needs and welfare include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation omitted). Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. The court must examine the effect on the child of severing a bond, and make "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). Our Supreme Court has explained:

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

*Id.* (some citations omitted).

The *K.T.* Court distinguished "extreme emotional consequences" from an "adverse impact" to the child. *Id.* at 1111. Specifically, the Court

cautioned that the orphans' court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.* at 1114. The Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.* Moreover, in reiterating that the parental bond is only one part of the analysis, the Court held that the "Section 2511(b) inquiry must also include consideration … [of] certain evidence **if it is present in the record**." *Id.* at 1113 n.28 (emphasis in original). The specific evidence at issue in *K.T.* related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home and the child's bond with foster parents; and whether the foster home met the child's developmental, physical, and emotional needs. *Id.* at 1112. The Court emphasized, however, that these factors were not exhaustive in the Section 2511(b) analysis. *Id.* at 1113 n.28. As noted above, the particular facts of each case determine the factors to be considered.

Further, the Court in *K.T.* recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. For instance, if relevant, the orphans' court "can equally emphasize the safety needs of the child" in its

analysis under Section 2511(b). *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). In *T.S.M.*, the Supreme Court stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. The Court directed that in weighing the bond considerations, "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail ... the result, all too often, is catastrophically maladjusted children." *Id.*

Turning to Parents' arguments, we review their claims regarding grounds for termination under Section 2511(a)(2). Father argues that the evidence was not clear and convincing because he obtained the required drug and alcohol, mental health, and domestic violence evaluations, and "repeatedly engaged and re-engaged" with the recommended programs "throughout this case." Father's Brief at 14 (cleaned up).

Notably, Father does not claim that he completed the programs. He acknowledges that he (1) was discharged three separate times from drug and alcohol treatment at Robinson Counseling for repeatedly missing sessions; (2) stopped attending mental health counseling at Robinson Counseling after attending around three sessions; (3) was discharged three separate times from the Batterers' Intervention Program for repeatedly missing sessions; and

(4) tested positive in 42 of 68 urine drug screens. *Id.* at 11-13. Based on his re-engagement with Robinson Counseling drug and alcohol and mental health services, as well as the Batterers' Intervention Program, Father reasons that "the record does not support that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *Id.* at 15. As discussed below, Father is not entitled to relief.

Similarly, Mother argues that the evidence was insufficient because she (1) participated in a drug and alcohol program at the Hazleton Treatment Center; (2) participated in drug screens through the color call-in program; and (3) "developed a safety plan" through the Domestic Violence Center. Mother's Brief at 11 (citing N.T. at 101). However, like Father, Mother does not and cannot assert that she successfully completed any program for substance abuse, mental health, or domestic violence.

With respect to her drug screens through the call-in program, Mother acknowledges that she tested positive, but asserts that the results "were inconsistent and faulty." *Id.* (citing N.T. at 102). Mother argues that the positive results were "faulty" because they did not show the presence of the prescription methadone and klonopin she was taking at the time.[8] *Id.* Mother asserts she "has not been using" illegal drugs, yet states that she is "willing to reengage in services to rectify her circumstances." *Id.* at 12 (citing N.T.

---

[8] Mother indicated that she was no longer taking the medications at the time of the termination hearing. *See* Mother's Brief at 11 (citing N.T. at 102).

at 104). Ultimately, Mother concedes that she failed to comply with the permanency plan, but maintains that she "was fighting a losing battle and believed she was not getting the help" she requested from CYS. *Id.* (citing N.T. at 103). The record belies Mother's claims.

The orphans' court found Parents "not at all credible in their denial of drug use." OCO at 2. As the court explained:

> Father testified that he never used cocaine and fentanyl. He incredibly maintained that all of his drug screens should have been all negative, that "a lot was falsified in my opinion." Mother minimized any drug use.
>
> The results of the drug testing indicated, in fact, that Parents were drug addicts. This drug testing was performed under a strict protocol with safeguards in place to assure the accuracy of the lab results. Father was tested 68 times starting on May 3, 2023, with his last positive screening on November 19, 2024, for cocaine. In this period, there were 42 total positive screens for an illegal controlled substance. On July 7, 2023, there was fentanyl detected, and on July 19, 2023, it was cocaine. The next day it was also benzoylecgonine (cocaine metabolite). On August 21, 2023, it was fentanyl again. This was a continuing pattern with the same results, except on occasional dates the testing revealing a negative finding of any drugs in his system. However, a majority of roughly two-thirds of the tests over that 20-month period, he had been positive for cocaine, fentanyl, or both.
>
> Similarly, Mother was a heavy user of cocaine and fentanyl beginning with her first testing report on April 27, 2023, through the last reported screen on September 11, 2024. There were a total of 45 tests during that period, and Mother was positive for these substances on 37 of them or about three-quarters of the time. There was testimony that cocaine can be in the person's system for a day or two, and even up to three or four days, while fentanyl is quicker, one to two days. The testing points to mainly daily use. The testing of Mother stopped after September 2024, due to her incarceration on October 12, 2024, until December 10, 2024, on a non-drug related offense.

*Id.* at 2-3 (citation omitted).

The orphans' court's findings are supported by the testimony and documentary evidence presented by Mr. Hockenbury from Northern Tier and by Parents themselves. ***See*** CYS Exhibit 2; ***see also*** N.T. at 9-35 (Mr. Hockenbury's testifying about protocols for collecting urine screens and confirming the accuracy of results); *id.* at 128-129 (Father's testifying that he never used cocaine and/or fentanyl, and that the positive drug screens were "falsified, in my opinion"); *id.* at 101 (Mother's testifying that she did the color call-in screening program with Father, and that "it doesn't make sense" that she had positive results).

Further, CYS caseworker, Ms. Stuart, testified that Parents did not appear for all of the scheduled drug screens. *Id.* at 81. Father, who had 68 screens (as compared to Mother who had 45), "could have participated in well over 100 urine screens" if he had been fully compliant. *Id.* at 86. Parents continually tested positive for illegal drugs.

As noted, Parents were referred to Robinson Counseling. With respect to Father, the orphans' court found:

> Father was referred to Robinson Counseling in June of 2023, for a drug and alcohol evaluation. The recommended course of treatment was level one individual outpatient care. His attendance was poor in 2023, and he was discharged against the medical advice on October 24, 2023. Father re-engaged with Robinson Counseling in March of 2024, but again with his poor attendance he was discharged for non-participation in August of 2024. There was a final attempt by Father when he reenrolled in November of 2024, as to which he never showed even though he was ordered to outpatient counseling. As previously noted, he

- 13 -

tested positive for cocaine and fentanyl on November 1, 15 and 18, 2024. Father testified he had given up at that time; however, he had ample opportunity in the preceding months to fully engage in drug counseling if he was sincere to act responsibly for Child's benefit.

OCO at 3-4 (cleaned up). The court's findings are supported by the testimony of Ms. Pasterchik, the clinical supervisor at Robinson Counseling, as well as Father's testimony. *See* N.T. at 38-43 (Ms. Pasterchik's testifying that Robinson Counseling discharged Father on three separate occasions for failing to attend his scheduled outpatient sessions, and his last intake assessment was on November 13, 2024, which resulted in the same recommendation for level one counseling, but Father failed to attend the first scheduled session, and made no further contact with Robinson Counseling); *see also id.* at 118-21 (Father's testimony about his sporadic attendance at Robinson Counseling's substance abuse program and his ultimate decision in November 2024 to not attend the first session because "I just kind of gave up hope…. There was just no incentive.").

As to Mother, the orphans' court found her lack of participation at Robinson Counseling "even more pronounced." OCO at 4. Indeed, other than Mother's self-serving testimony, the record lacks any evidence that Mother obtained an evaluation or engaged in treatment. *See* N.T. at 83 (Ms. Stuart's testimony that Mother never followed through with drug and alcohol counseling); *see also id.* at 107 (Mother's stating that she attended an

unspecified number of sessions at Robinson Counseling, but "did not complete treatment").

Mother testified that she was "more than willing to do anything," including attending treatment at Robinson Counseling. *Id.* at 107. Although Mother's last drug test was in September 2024, she stated that she would re-engage with drug screening, and "do anything to get my daughter back. Drugs are not worth my daughter…." *Id.* at 104-06. Mother also claimed that, "for a few months now," she had been receiving drug treatment at the Hazleton Treatment Center, after being released from prison in December of 2024.[9] *Id.* at 106-07. Assuming, *arguendo*, that Mother was receiving treatment, she provided no documentation of the treatment. *Id.* at 107. Accordingly, there is no definitive evidence that Mother complied with or completed programs to address her drug addiction.

Concerning Parents' mental health, Ms. Singer, the clinician at Robinson Counseling, testified that CYS referred Father to the agency in May 2024, when he received an evaluation. *See id.* at 66. She testified that Father began treatment on May 10, 2024, but failed to appear at the next three sessions. *See id.* at 67. Father subsequently requested that Ms. Singer be assigned as his therapist, and participated in two sessions between August

---

[9] Mother was incarcerated from October 12, 2024, until December 10, 2024, "on a non-drug related offense." OCO at 3.

and September 2024, before lapsing again. *See id.* at 68. Thus, Father never completed his mental health treatment.

Ms. Singer testified that Mother was also referred to Robinson Counseling for treatment in May 2024, but did not attend her initial evaluation. Robinson Counseling rescheduled Mother's evaluation two times, but Mother failed to appear. *Id.* at 69-70.

CYS also presented the testimony of Ms. Griemsmamn from the Batterers' Intervention Program. Ms. Griemsmamn testified that the program consisted of 27 classes. *Id.* at 53. She explained that Father attended two classes in October 2023, but was discharged from the program because he failed to attend the next three classes. *See id.* Father re-engaged with the program in March 2024, but attended no scheduled classes, and again was discharged. *See id.* at 54. Father re-engaged in the batterers' intervention program for a final time in July 2024, and attended one class. *See id.* After Father failed to appear for the next three classes, he was discharged for the third time. *See id.*

Regarding Mother's involvement with the Domestic Violence Center, CYS caseworker, Ms. Stuart, testified that "there was some contact there." *Id.* at 89-90. However, Ms. Stuart did not receive any information about dates or times, and Mother testified only that she "spoke with the Domestic Violence Center." *Id.* at 101, 104. Ms. Stuart testified that Mother did not complete any programs to address the reasons for Child's dependency. *Id.* at 84.

Based on the foregoing evidence, we discern no abuse of discretion by the orphans' court in finding grounds for terminating Parents' parental rights pursuant to Section 2511(a)(2). As to Father, there is no merit to his argument that the evidence was insufficient because he "repeatedly engaged and re-engaged" in services. The law is well-settled that a court may properly reject as untimely or disingenuous a parent's vow to follow through with necessary services. **See S.C.**, 247 A.3d at 1105. There is no dispute that Father failed to complete the court-ordered programs. **See** N.T. at 128-29. As Father testified, he "gave up hope" with drug treatment in November 2024, the same month that CYS filed the termination petitions. **Id.** at 118-21. Therefore, it was reasonable for the court to conclude that Father's repeated and continued incapacity, abuse, neglect, and/or refusal to complete his court-ordered programs caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being.

Similarly, there is no merit to Mother's argument regarding grounds for termination under Section 2511(a)(2). Mother minimized her history of drug use and declared, without substantive support, that her positive test results were "faulty." Mother's Brief at 11. The orphans' court's rejection of Mother's promise to engage in services "to rectify her circumstances" is supported by the law and evidence in this case. **See S.C.**, 247 A.3d at 1105. Thus, we discern no abuse of discretion by the court's finding that Mother's repeated and continued incapacity, abuse, neglect, and/or refusal has caused Child to

be without essential parental care, control or subsistence necessary for her physical or mental well-being, and that the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

With respect to Section 2511(b), Parents argue that the court abused its discretion in finding that termination served Child's needs and welfare because they share a bond with Child. *See* Father's Brief at 23-24; *see also* Mother's Brief at 14. We disagree.

The orphans' court found that "there is reciprocal love and connection between" Child and Parents. OCO at 5. It is undisputed that Child enjoys her visits with Parents, which are supervised by Paternal Grandparents. *See* N.T. at 143, 156. However, the court did not find that Child's relationship with Parents was "necessary and beneficial" or that Child would suffer "'extreme emotional consequences' or significant, irreparable harm" if Parents' rights were terminated. OCO at 5-6 (citing *K.T.*, 296 A.3d at 1109-10). The court reasoned:

> Child has been living with grandparents since her placement; first, with [P]aternal [G]randparents for a few months[,] and then with the maternal grandmother and step-grandfather [(Maternal Grandparents)] to the present time. They are intending to adopt Child. This pre-adoptive placement has provided Child with permanency and a stable, loving home. Child is thriving [and] doing well as a bright, happy and energetic six-year-old.

*Id.* at 5.

The record supports the orphans' court's findings. Child was placed in the pre-adoptive home of Maternal Grandparents in October 2023. *See* N.T.

at 150-51. Ms. Wall, the foster care caseworker, testified that she has visited Child in the home every month since December of 2023. Ms. Wall stated that Child is bonded with Maternal Grandparents, and described their relationship as one of "mutual respect and love." *Id.* at 152. Ms. Wall also testified that Maternal Grandparents "provide a stable home environment" and ensure that Child's developmental, educational, and social needs are met. *Id.* at 151. In contrast, the court noted:

> [T]here is domestic violence between Parents. Yet Father only attended two out of twenty-seven sessions of the batterers' program that he was court-ordered to attend. [Child] became upset and frightened when there was an incident in her presence between Father and paternal grandmother during visitation at her paternal grandmother's home. Parents' drug use would be detrimental to [Child's] emotional needs and welfare. They exhibit poor judgment and choices putting their addiction above Child's stability.

OCO at 5-6.

With respect to the incident involving Father and paternal grandmother, Ms. Wall testified that Child described seeing Father "yelling at" Paternal Grandmother "and how that scared her." N.T. at 156. More specifically, the CYS caseworker, Ms. Stuart, testified that CYS received a report that Child "heard arguing" and "came out of her bedroom to see … the grandmother on the floor, and Father going out the door and slamming it…." *Id.* at 179. Ms. Stuart testified that CYS investigated the report and the outcome was that Child "was consistent with her stories, and we were already open with the

case. So we were just continuing to provide ongoing services." ***Id.*** at 179-80.

In sum, the orphans' court properly considered Child's needs and welfare pursuant to Section 2511(b) in concluding that Child will be best served by termination of Parents' rights. The court found that Child did not have a necessary and beneficial bond with Parents, and Child's need for the permanency and stability provided by Maternal Grandparents was determinative. We discern no abuse of discretion. ***See T.S.M.***, 71 A.3d at 267 (stating that a child's "continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders … cannot be misconstrued as bonding").

Decrees affirmed.

President Judge Emeritus Panella did not participate in the consideration or decision of this case.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/25/2025

- 20 -